J-A13029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: T.C. AND C.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.C., JR. | No. 2023 WDA 2015 |

Appeal from the Decree December 2, 2015,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No: A-14-132

BEFORE:  OLSON, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 17, 2016**

Appellant, D.C., Jr. ("Father"), appeals from the decree entered December 2, 2015, in the Court of Common Pleas of Allegheny County, which involuntarily terminated his parental rights to his minor sons, T.C., born in September of 2001, and C.C., born in October of 2002 (collectively, "the Children").  After careful review, we affirm.

This appeal arises from the petition for involuntarily termination of parental rights filed by the Children's mother, J.B. ("Mother"), on November 21, 2014.[1]  The record reveals that Mother and Father began dating in June of 2000, and separated in approximately 2003.  N.T., 7/8/15 and 7/9/15, at 116-17, 129-30.  Following separation, Father played only a minimal role in the Children's lives.  Father visited with the Children on occasion, and sometimes spoke to the Children on the phone.  *Id.* at 13-48, 85-86. Meanwhile, Mother married her current husband, E.B. ("Stepfather"), on

---

[1] Amended termination petitions were filed on March 3, 2015, and March 13, 2015.

September 4, 2005. *Id.* at 7. Stepfather has assisted Mother in caring for the Children since that time, and the Children describe Stepfather as their "Dad." *Id.* at 44, 59.

Father's final visit with the Children took place in February of 2010. *Id.* at 47-48. Father was incarcerated about a year later, in March of 2011, and remained incarcerated until May of 2015. N.T., 8/4/2015, at 4, 53. Starting in about August of 2011, Father sent letters and cards to the Children from prison. N.T., 7/8/15 and 7/9/15, at 49. Father also attempted to talk to the Children on the phone. N.T., 8/20/15 and 8/21/15, at 126, 146-47. However, the Children refused to speak to Father on the phone and declined to read his letters. *Id.* at 126, 133-34, 146-47. In approximately September of 2014, Father sent Mother and Stepfather a document indicating that he intended to seek custody rights with respect to the Children upon his release from incarceration, which prompted the filing of the subject termination petitions. N.T., 7/8/15 and 7/9/15, at 64, 66-67.

A termination hearing was held over the course of several days, starting on July 8, 2015, and concluding on August 21, 2015. Following the hearing, on December 2, 2015, the orphans' court entered its decree involuntarily terminating Father's parental rights to the Children. Father timely filed a notice of appeal on December 23, 2015, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

I. Did the [orphans'] court abuse its discretion and commit an error of law when it held that the statutory grounds for involuntary termination of Father's parental rights to [the] Children under 23 Pa.C.S.A. § 2511(a)(1) were met, thereby determining Father, by conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition either had evidenced a settled purpose of relinquishing parental claim to a child or had refused or failed to perform parental duties?

II. Did the [orphans'] court abuse its discretion and commit an error of law when it determined that the statutory grounds for involuntary termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) were met and that the repeated and continued incapacity, abuse, neglect or refusal of Father has caused [the] Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions [*sic*] and that Father could [not] or would not remedy the causes of the incapacity, abuse, neglect or refusal?

III. Did the [orphans'] court abuse its discretion when it determined that terminating Father's parental rights best served the development[al], physical and emotional needs and welfare of [the] Children?

Mother's Brief at 3-4 (suggested answers omitted).

We consider Father's claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often

- 3 -

have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(1) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1). To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to

- 5 -

analyze Section 2511(b). *Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004)). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Critically, incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012) (discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975)).

In the instant matter, the orphans' court found that Father failed to perform parental duties for a period of time well in excess of the six months immediately preceding the filing of the termination petition. The court reasoned that Father had only "minimal and sporadic contact" with the Children from 2005 until his final visit in February of 2010. Findings of Fact, 12/2/15, at ¶ 5. While the court acknowledged that Father sent letters to

the Children and attempted occasional phone calls following his incarceration in 2011, the court observed that Father sent only six letters to each child during all of 2014.  *Id.* at ¶ 12-13.

Father argues that the trial court "overlooked" credible testimony that he was involved in the Children's lives up until February of 2011, rather than 2010, and that Mother created insurmountable obstacles which inhibited his ability to maintain a relationship with the Children following his incarceration in March of 2011.  Father's Brief at 18.  Father insists that he did "as much as he possibly could have done" during his incarceration in order to maintain a place of importance in the Children's lives.  *Id.* at 16.  Father asserts that he sent cards and letters to the Children during his incarceration, that he spoke to the Children on the phone, and that he arranged for birthday and Christmas gifts to be sent to the Children on his behalf.  *Id.* at 17.  Finally, Father emphasizes that he prepared and served Mother with a custody complaint in September of 2014.  *Id.*

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion.  During the termination hearing, Stepfather provided extensive testimony concerning Father's lack of involvement in the Children's lives.  Despite occasional visits, Stepfather explained that Father's contact with the Children "was minimal throughout my whole relationship with the boys."  N.T., 7/8/15 and 7/9/15, at 35. While Father also called the Children on the phone, these phone calls were

always "very short," and "[a]s the years progressed, they lost interest, and it got to the point of where they did not want to talk, where if they were asked, you know, do you want to talk, they would say no." *Id.* at 85-86. Stepfather testified that Father's last visit with the Children took place following a snowstorm in February of 2010. *Id.* at 47, 72, 74. Stepfather recalled that there was "a humongous amount of snow" in his yard, and that Father and the Children constructed an igloo together. *Id.* at 48.

Stepfather further testified that Father was incarcerated in 2011, and that he began sending letters to the Children from jail in approximately August of 2011. *Id.* at 49. Stepfather stated that Father sent letters to the Children, on average, about once per month following his incarceration. *Id.* Stepfather later clarified that, "[t]here were a couple time frames in there where maybe one or two months, maybe three months, where no letter was received." *Id.* Stepfather recounted that the Children read the first letter that Father sent following his incarceration, but that afterward they refused to read Father's letters. *Id.* at 50-51. The Children were always asked if they would like to read the letters sent by Father, but the Children declined to do so each time, so Stepfather and Mother "put the letters away" so that the Children could read them later if they wanted to. *Id.* at 51. The Children never wrote letters back to Father nor did they ask to write letters back. *Id.* at 59. Stepfather testified that Father wrote to the Children on only six occasions during all of 2014. *Id.* at 49-50. Specifically, Father sent

letters or cards to the Children in January, March, July, September, October, and December. *Id.* at 49-50. Stepfather explained that he and Mother decided to a file a petition to terminate Father's parental rights after they received correspondence from Father in September of 2014, indicating that he would soon be released from incarceration, and that he would be seeking custody of the Children.[2, 3] *Id.* at 64, 66-67.

Accordingly, the record supports the finding of the orphans' court that Father failed to perform parental duties for the six months immediately preceding the filing of Mother's initial termination petition on November 21, 2014. During the relevant six month period, Father wrote to the Children on only three occasions, once in July, once in September, and once in October. It does not appear that Father did anything else in an effort to parent the

---

[2] Father's correspondence was admitted into evidence as Respondent's Exhibit A. N.T., 7/8/15 and 7/9/15, at 69. However, the certified record on appeal does not contain a copy of this exhibit. Father's counsel characterized the correspondence as "a Complaint in Custody," and counsel for Mother and Stepfather objected, stating "[i]t wasn't a Complaint in Custody. It wasn't properly filed, it wasn't properly served. It was nothing except a piece of paper." *Id.* at 66-67. Counsel for Mother and Stepfather later described the correspondence as "an unfiled custody complaint" and asserted that Father did not successfully file a custody complaint until January of 2015. *Id.* at 69, 164.

[3] Mother testified that she received a collect call from Father on one occasion during his incarceration, and that she did not take the call because "I didn't want to talk to him and the [C]hildren didn't want to talk to him." N.T., 7/8/15 and 7/9/15, at 157, 174. Similarly, during *in camera* interviews with the orphans' court, the Children stated that their paternal grandmother would often ask them if they would like to speak to Father on the phone, but that they did not want to. N.T., 8/20/15 and 8/21/15, at 126, 146-47.

Children during this time, other than notifying Mother and Stepfather that he intended to seek custody, and possibly attempting to speak to the Children on the phone.

Further, it is well-settled that, "[a]lthough it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." **Id.** (citing **In re D.J.S.**, 737 A.2d 283, 286 (Pa. Super. 1999)). Here, our review of the whole history of this case reveals that Father played a minimal role in the Children's lives even prior to his incarceration. While Father claimed during the termination hearing that he was much more involved in the Children's lives than the testimony of Mother and Stepfather would suggest, the court was free to reject Father's assertions, and to conclude that he did not "act affirmatively with good faith interest and effort" in order to maintain a relationship with the Children. **B.,N.M.**, 856 A.2d at 855. At the time of the termination hearing, T.C. was thirteen years old, while C.C. was twelve years old. Given Father's failure to parent the Children for over a decade, we conclude that it was proper for the orphans' court to terminate Father's parental rights pursuant to Section 2511(a)(1).

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

- 10 -

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court found that terminating Father's parental rights would best serve the needs and welfare of the Children. The court emphasized that the Children do not have a parent/child bond with Father, and that the Children instead consider Stepfather to be their "Dad." Conclusions of Law, 12/2/15, at ¶ 6. Father argues that it was improper for the orphans' court to conclude that he does not have a bond with the Children, because the court reached this conclusion without a bonding evaluation performed by an expert. Father's Brief at 20.

Stepfather testified that the Children would ask about Father "in the beginning of [Mother] and my and the boys' relationship[.]"  N.T., 7/8/2015 and 7/9/2015, at 58.  However, "as the years progressed, it dwindled to the point of where they didn't even want to bring him up."  *Id.*  Stepfather explained that he has "fantastic relationship" with the Children, and stated, "they're my sons.  I mean, I've raised them since they were two and three . . . ."  *Id.* at 59.  Similarly, Mother testified that the Children never bring up Father in conversation.  *Id.* at 151.  Mother observed that Stepfather treats the Children "as his sons and the kids view him as their father. . . . [T]hey have a bond with [Stepfather] that they've never had with their father."  *Id.*  Notably, during their *in camera* interviews with the orphans' court, the Children did not refer to Father as their father, but instead described Stepfather as their "Dad."  N.T., 8/20/2015 and 8/21/2015, at 123, 127, 142, 153-54.

Thus, the record supports the conclusion of the orphans' court that terminating Father's parental rights would best serve the needs and welfare of the Children.  At the time of the termination hearing, the Children had not seen Father in over five years.  Further, the record supports the court's finding that Father was only minimally involved in the Children's lives even prior to his incarceration in March of 2011.  Given Father's complete absence from the Children's lives over the last five years, and given his minimal involvement during the previous years, it was reasonable for the court to

infer that Father and the Children do not share a parent/child bond. As this Court has explained, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). In addition, while Father argues that the court should have ordered a bonding evaluation, it is well-settled that a court in a termination proceeding "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008) (citation omitted).

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to the Children, we affirm the decree of the orphans' court.

Decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/17/2016

- 13 -